SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
MICHAEL H. AHRENS, Cal. Bar No. 44766
TERRENCE V. PONSFORD, Cal. Bar No. 42648
CRAIG STUPPI, Cal. Bar No. 51663
ORI KATZ, Cal. Bar No. 209561
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:    415-434-9100
Facsimile:    415-434-3947

Attorneys for Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| In re | Bk. No. 03-40516<br>Jointly Administered |
| DILLINGHAM CONSTRUCTION HOLDINGS, INC., and related entities,<br><br>Debtors.[1] | Chapter 11<br><br>**DISCLOSURE STATEMENT FOR DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN**<br><br>Date:      June 23, 2004<br>Time:     11:00 a.m.<br>Place:    United States Bankruptcy Court<br>             1300 Clay Street, Oakland, CA |

---

[1] The name of each Debtor and its case number are set forth on the following page.

Name of each Debtor and its Bankruptcy case number:

DILLINGHAM CONSTRUCTION HOLDINGS, INC., case no. 03-40516

DILLINGHAM CONSTRUCTION CORPORATION, case no. 03-40517

WATKINS ENGINEERS & CONSTRUCTORS, INC., case no. 03-40518

DILLINGHAM CONSTRUCTION, N.A., INC., case no. 03-40519

DILLINGHAM CONSTRUCTION PACIFIC BASIN, LTD., case no. 03-40520

NIELSEN DILLINGHAM BUILDERS, INC., case no. 03-40521

DILLINGHAM CONSTRUCTION PACIFIC, LTD., case no. 03-40522

INLAND INDUSTRIAL CONTRACTORS, INC., case no. 03-40523

CONSTRUCTION DESIGN, INC., case no. 03-40524

DILLINGHAM CONSTRUCTION OVERSEAS, LTD., case no. 03-40525

PACLANTIC CONSTRUCTION, INC., case no. 03-40526

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 2 of
55

THIS DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR SOLICITATION OF ACCEPTANCES OF THE DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN DATED JUNE 23, 2004. DISTRIBUTION OF THIS DISCLOSURE STATEMENT TO CREDITORS AND EQUITY SECURITY HOLDERS HAS BEEN AUTHORIZED BY AN ORDER OF THE BANKRUPTCY COURT. THE BANKRUPTCY COURT HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR DETERMINATION OF ANY FACTUAL STATEMENT OR DOLLAR VALUE SET FORTH IN THE PLAN OR THE DISCLOSURE STATEMENT.

I.

INTRODUCTION

This Disclosure Statement to Debtors' Second Amended Joint Chapter 11 Plan ("Disclosure Statement") has been prepared by Dillingham Construction Holdings, Inc. and certain of its affiliates (collectively, "Debtors") and is being distributed to creditors and shareholders for the purpose of providing adequate information to enable them to make an informed judgment in exercising their right, if any, to vote to accept or reject the Debtors' Second Amended Joint Chapter 11 Plan ("Plan), and for the purpose of soliciting acceptances to the Plan.

Acceptance or rejection of the Plan is important and must be made in writing. An acceptance or rejection of the Plan may be made by completing the accompanying Ballot and mailing or faxing it to Sheppard, Mullin, Richter & Hampton LLP, Four Embarcadero Center, Suite 1700, San Francisco, California 94111, Fax Number (415) 434-3947, Attention: Peter Stone. **In order for a vote to be counted, the completed Ballot must be received no later than 5:00 p.m. Pacific Time, August 3, 2004.**

This Disclosure Statement describes the business background and operating history of Debtors, the significant events that preceded the filing of these chapter 11 cases and the major events that have taken place since the filing. This Disclosure Statement also summarizes the terms of the Plan, which divides creditor claims and interests of shareholders into classes and provides for the satisfaction of allowed claims.

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 3 of 55

If the Plan is confirmed by the Court, it will bind all creditors and interest holders regardless of whether an individual claimant voted for or against the Plan and regardless of whether that claimant filed a proof of Claim or Interest.

With limited exceptions (two pieces of real property in Florida, one piece of real property in Kansas), all of the Debtors' assets were encumbered by first priority liens and security interests of Debtors' senior secured lenders at the time the Cases were filed. During the Cases and in connection with the Senior Secured Lenders' continued funding of Debtors' operations, the Court granted liens and interests to the Senior Secured Lenders in all of Debtors' assets, including those three pieces of real property not previously subject to the senior secured lenders' liens and interests. Accordingly, there is no value in any of those encumbered assets for Debtors' general unsecured creditors. However, in connection with confirmation of the Plan, the Senior Secured Lenders have agreed to provide for other creditors in four significant ways: (1) by making $200,000 in cash and the proceeds of certain avoidance actions available to the general unsecured creditors; (2) by GMAC CF contributing 7.2% of certain receivable recoveries, subject to certain reserved rights as more specifically defined in the Plan, to a Liquidating Trust that will be created upon confirmation of the Plan; (3) by contributing funds to provide for the payment in full of all allowed priority and administrative claims; and (4) by releasing certain significant claims against Debtors. The above contributions, however, are subject to the Senior Secured Lenders' right to withdraw support for the Plan at any time prior to confirmation if the valid and allowable administrative and priority claims in these cases exceed $1,000,000, not including in this cap, however, allowed administrative claims for legal fees and expenses incurred by Debtors' and the Committee's bankruptcy attorneys and certain other agreed upon exceptions.

DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY BEFORE YOU VOTE ON THE PLAN.

Case: 03-40516    Doc# 1043    Filed: 06/28/04    Entered: 06/28/04 16:20:18    Page 4 of 55

## II.

## DEFINITIONS

A.    Defined Terms

As used in this Disclosure Statement, capitalized terms have the meanings set forth below.  Any term that is not defined herein, but is used in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

"Administrative Expense" means an expense incurred by a Debtor under the Bankruptcy Code for costs and expenses of administration allowed under the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of Debtors, (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code §§ 330(a) or 331, and (c) the United States Trustee's fees and charges assessed against Debtors' Estates under 28 U.S.C. § 1930(a)(6).

"Allowed Claim" means:  (a) a Claim that has been listed by Debtors on their Schedules (as may be amended from time to time) as other than disputed, contingent, or unliquidated, to the extent that it is not otherwise a Disputed Claim; (b) a Claim for which a proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, to the extent that it is not otherwise a Disputed Claim; or (c) a Claim that is allowed:  (i) in a stipulation or other agreement executed by Debtors and Claim holder on or before the Effective Date, or by the Liquidating Trustee and Claim holder after the Effective Date; and (ii) in a Final Order.

"Allowed . . . Claim" means an Allowed Claim in the specified Class or of the specified type.

"Avoidance Action" means an avoidance action under Bankruptcy Code §§ 544, 545, 547, 548, 549 or 550, but does not include the FFIC Avoidance Actions or the GMAC CF Avoidance Actions.

"Avoidance Recoveries" means any Cash recovered through an Avoidance Action.

"Bankruptcy Code" means title 11 of the United States Code, §§ 101-1330.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the local rules of the Court.

"Bar Date" means the applicable bar date by which a proof of claim must be or must have been filed.

"Business Day" means a day that is not a Saturday, Sunday, or legal holiday.

"Case" or "Cases" means Debtors' voluntary cases pending in the Court under chapter 11 of the Bankruptcy Code, individually or collectively.

"Cash" means cash, cash equivalents and other readily marketable securities or instruments.

"CDI" means Construction Design, Inc., a Kansas corporation and one of the Debtors herein.

"Claim" means a claim, as defined in Bankruptcy Code § 101(5), against a Debtor.

"Claims Objection Deadline" means the deadline for objecting to Claims, as set forth in the Plan.

"Class" means a class of Claims or Interests as described in the Plan.

"Committees" means the Official Committees of Unsecured Creditors that the United States Trustee appointed in the Cases of WEC, Inland and CDI, or such successor Committees as may be appointed.

"Confirmation" means the entry of the Confirmation Order on the docket of the Court.

"Confirmation Date" means the date on which the Court enters the Confirmation Order on its docket.

"Confirmation Hearing" means the hearing held by the Court on Confirmation of the Plan, as such hearing may be continued from time to time.

1    "Confirmation Order" means the Court order confirming the Plan under

2    Bankruptcy Code § 1129.

3            "Court" means the United States Bankruptcy Court for the Northern District

4    of California, Oakland Division, or any other court that exercises jurisdiction over a

5    Debtor's Case.

6            "DCC" means Dillingham Construction Corporation, a Nevada corporation

7    and one of the Debtors herein.

8            "DCHI" means Dillingham Construction Holdings, Inc., a Delaware

9    corporation and one of the Debtors herein.

10           "DCII" means Dillingham Construction International, Inc., a Nevada

11    corporation and an affiliate of DCHI, but not one of the Debtors herein.

12           "DCNA" means Dillingham Construction N.A., Inc., a Nevada corporation

13    and one of the Debtors herein.

14           "DCOL" means Dillingham Construction Overseas, Ltd., a Nevada

15    corporation and one of the Debtors herein.

16           "DCPBL" means Dillingham Construction Pacific Basin, Ltd., a Nevada

17    corporation and one of the Debtors herein.

18           "DCPL" means Dillingham Construction Pacific, Ltd., a Hawaii corporation

19    and one of the Debtors herein.

20           "Debtor or Debtors" refers to Dillingham Construction Holdings, Inc., a

21    Delaware corporation, Dillingham Construction Corporation, a Nevada corporation,

22    Dillingham Construction, N.A., Inc., a Nevada corporation, Watkins Engineers &

23    Constructors, Inc., a Florida corporation, Dillingham Construction Pacific, Ltd., a Hawaii

24    corporation, Nielsen Dillingham Builders, Inc., a Nevada corporation, Dillingham

25    Construction Pacific Basin, Ltd., a Nevada corporation, Inland Industrial Contractors, Inc.,

26    a Florida corporation, Construction Design, Inc., a Kansas corporation, Paclantic

27    Construction, Inc., a Nevada corporation, and Dillingham Construction Overseas, Ltd., a

28    Nevada corporation, individually or collectively.

"Debtor-in-Possession Financing" means the Court-approved, debtor-in-possession financing that GMAC CF and FFIC provided during the Case.

"Debtors' Counsel" means Sheppard, Mullin, Richter & Hampton LLP, Four Embarcadero Center, 17th Floor, San Francisco, California 94111, attention Ori Katz, Esq.

"Disclosure Statement" means the disclosure statement (including all exhibits thereto or referenced therein) that relates to the Plan, as approved by the Court pursuant to Bankruptcy Code § 1125, as the same may be amended, modified or supplemented.

"Disputed Claim" (including Disputed Priority Claim, Disputed Priority Tax Claim and Disputed Administrative Expense) means a Claim as to which a proof of Claim was Filed or is deemed Filed under Bankruptcy Rule 3003(b)(1) and as to which (i) the Debtor against which the Claim is asserted, or any party in interest entitled to do so, has Filed an objection by the Claims Objection Deadline; or (ii) Debtors have moved for estimation in accordance with Bankruptcy Code § 502(c) or Bankruptcy Rule 3018. Before the Claims Objection Deadline — and except to the extent that a Claim may have been allowed by a Final Order — a Claim is a Disputed Claim only to the extent that:

a. The Claim is listed on the Debtors Schedules as disputed, unliquidated, contingent or unknown;

b. The Claim's priority or status as a Secured Claim or Unsecured Claim, as listed on the proof of Claim, differs from the Claim's priority or status as a Secured Claim or Unsecured Claim, as listed on the Debtors Schedules; or

c. An objection to the Claim has been filed.

"Effective Date" means the date on which all Administrative Expenses, Priority Claims and Priority Tax Claims are paid or otherwise provided for by Debtors. The Effective Date shall occur no earlier than the 11th day after the Confirmation Date, unless a stay of the Confirmation Order is in effect in which case the "Effective Date" may occur the first business day after the day the stay is vacated.

Case: 03-40516    Doc# 1043    Filed: 06/28/04    Entered: 06/28/04 16:20:18    Page 8 of 55

"Estates" means the relevant estate created in each of the chapter 11 Cases under Bankruptcy Code § 541 and existing as of the Effective Date.

"FFIC" means Fireman's Fund Insurance Company and each of its surety subsidiaries, including The American Insurance Company, National Surety Corporation, Associated Indemnity Corporation and American Automobile Insurance Company.

"FFIC Avoidance Actions" means each Avoidance Action assigned to FFIC under the Plan, as described in Exhibit A to the Plan.

"Filed" means duly and properly filed with the Court and reflected on the Court's official docket.

"Final Order" means an order or judgment of the Court, as entered on the docket of the Court, that has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, seek review or rehearing or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

"GMAC CF" means GMAC Commercial Finance LLC, a Delaware limited liability company, as successor in interest to GMAC Commercial Credit LLC, a New York limited liability company.

"GMAC CF Avoidance Actions" means each avoidance action assigned to GMAC CF under the Plan, as described in Exhibit B to the Plan.

"IICI" means Inland Industrial Contractors, Inc., a Florida corporation and one of the Debtors herein.

"Interest" means the rights of the holders of the equity securities of Debtors and the rights of any entity to purchase or demand the issuance of any equity security of Debtors, including: (a) redemption, conversion, exchange, voting, participation, and dividend rights; (b) liquidation preferences; and (c) stock options and warrants.

1       "Intercreditor Schedule" means the schedule attached to the Plan as Exhibit

2  C, which sets forth the division of assets between FFIC and GMAC CF.

3       "Liquidating Trust" means that certain trust established pursuant to the

4  Liquidating Trust Agreement.

5       "Liquidating Trust Agreement" means that certain agreement to be entered

6  into by the Liquidating Trustee in the form to be presented by Debtors at the Confirmation

7  Hearing.

8       "Liquidating Trust Assets" means all of the property in the Liquidating Trust

9  and under the custody or control of the Liquidating Trustee after the Effective Date.

10       "Liquidating Trustee" means the Person (a) authorized to exercise and

11  perform the rights, powers and duties held by the Estate under the Liquidating Trust

12  Agreement, (b) having possession and control of the corpus of the Liquidating Trust, and

13  (c) given certain rights and duties under the Liquidating Trust Agreement.

14       "NDBI" means Nielsen Dillingham Builders, Inc., a Nevada corporation and

15  one of the Debtors herein.

16       "Other Secured Claims" means all Secured Claims other than the Secured

17  Claims of GMAC CF and FFIC.

18       "Paclantic" means Paclantic Construction, Inc., a Nevada corporation, and

19  one of the Debtors herein.

20       "Pension Plan" means the Dillingham Construction Pension Plan, originally

21  effective November 1, 1986, and any other pension plans of any Debtors.

22       "Person" means a natural person, or any legal entity or organization

23  including, without limitation, any corporation, partnership (general or limited), limited

24  liability company, business trust, unincorporated organization or association, joint stock

25  company, trust, association, governmental body (or any agency, instrumentality or political

26  subdivision thereof), or any other form of legal entity.

27       "Petition Date" means January 28, 2003.

28

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 10 of 55

"Plan" means Debtors' Second Amended Joint Chapter 11 Plan dated as of June 23, 2004, and all exhibits attached thereto or referenced therein, as the same may be amended, modified or supplemented.

"Post-Effective Date Limited Notice Service List" means those persons listed on the Court-approved limited notice service list as of the date of the service of the Plan, and as subsequently amended.

"Priority Claim" means an Allowed Claim entitled to priority against an Estate under Bankruptcy Code §§ 507(a)(3), 507(a)(4), or 507(a)(6).

"Priority Tax Claim" means an Allowed Claim entitled to priority against an Estate under Bankruptcy Code §§ 502(i) and 507(a)(8).

"Property" means all property of Debtors' Estates of any nature whatsoever, real or personal, tangible or intangible, previously or now owned by Debtors, or acquired by Debtors' Estates, as defined in Bankruptcy Code § 541.

"Receivable Recoveries" means the amount received by GMAC CF from the following of Debtors' accounts receivable, causes of action or claims on which a security interest has been granted to the Senior Secured Lenders, and which are to be distributed to GMAC CF pursuant to the Plan: (1) all interests of Debtors to that portion of the Dillingham-Ray Wilson Joint Venture arising out of a contract with the City of Los Angeles for the Hyperion Solids Handling C-74d1 Digester Expansion Phase I, and all rights of Debtors related to those interests, (2) all claims and rights of Debtors in connection with Debtors' construction of a cement manufacturing line in Midlothian, Texas, for Holcim (Texas) Limited Partnership, fka Holnam Texas Limited Partnership, including all claims and rights against Humboldt Wedag, Inc. and Triad Electric & Controls, Inc., (3) all interests of Debtors to the joint venture with The Lane Construction Corporation for the bidding and construction of improvements for the Olmstead Locks on the Ohio River in Olmstead, Illinois, (4) all claims and rights of Debtors in connection with the Libertyville micro-tunneling project, (5) all interests of Debtors to the Parsons-Dillingham Metrorail Joint Venture, including all claims and rights relating to any

litigation or actions arising from those interests, subject to such claims and defenses as may be asserted by parties other than Debtors, (6) any funds being held in escrow arising from the Napa Valley EPA Project, and (7) the proceeds from the sales of equipment from the Olmstead project. The Receivable Recoveries shall be subject to FFIC's prior rights of equitable subrogation, which, if exercised, could impair or eliminate the return to creditors on the Receivable Recoveries.

"Rejected Agreements" means all executory contracts and unexpired leases to which any Debtor was a party and not previously assumed. Debtors will reject the Rejected Agreements on the Effective Date.

"Schedules" means the Schedules of Assets and Liabilities, as amended, that each Debtor Filed in compliance with Bankruptcy Code § 521(1).

"Secured Claim" means a Claim that is secured by a lien against property in which an Estate has an interest or that is subject to setoff under Bankruptcy Code § 553. A Claim is a Secured Claim only to the extent of the value of the claimholder's interest in that property or to the extent of the amount subject to setoff, as applicable, as determined under Bankruptcy Code § 506(a).

"Senior Secured Lenders" means FFIC and GMAC CF, individually, and, together, and as the successors and assigns of the Senior Noteholders.

"Senior Noteholders" shall mean Principal Life Insurance Company, Connecticut General Life Insurance Company, Life Insurance Company of North America, Lincoln Life & Annuity Company of New York, and the Lincoln National Life Insurance Company, or their assignees, in their capacity as prepetition lenders to Debtors, or their assignees.

"Unclaimed Property" means any distribution or distributable property unclaimed on or after the Effective Date or the date on which an additional distribution would have been made to the holder of an Allowed Claim. Unclaimed Property will include (a) checks (and the funds represented thereby) returned as undeliverable without a proper forwarding address; (b) funds for checks that are not cashed 180 days after mailing;

and (c) checks (and the funds represented thereby) not mailed or delivered because no address at which to mail or deliver the property was available.

"Unsecured Claim" means a Claim that is not an Administrative Claim, a Priority Tax Claim, a Priority Claim, or a Secured Claim.

"Unsecured Claimant" means a claimant with an Unsecured Claim.

"WEC" means Watkins Engineers & Constructors, Inc., a Florida corporation and one of the Debtors herein.

III.

## DESCRIPTION OF PREPETITION BUSINESS AND OPERATIONS

A.      Historical Background

1.      Dillingham Construction Holdings, Inc.

DCHI owns all of the outstanding common stock of Dillingham Construction Corporation, which in turn owns the outstanding stock of various operating subsidiaries, which together are the Debtors in these cases.  In discussing the general historical background of Debtors, the generic term "Dillingham" is used to refer to all or some of Debtors depending on the context.

For many years, Debtors operated as general contractors on large scale construction projects throughout the world.  Dillingham traces its roots back to the founding of the business known as Hawaiian Dredging by Walter Dillingham in 1902.  Dillingham's early projects included the dredging of the entrance to and the construction of the first dry-dock at the Pearl Harbor Naval facility in Honolulu.  Further dredging activities would later serve to reclaim over 5,000 acres of land in Honolulu where the Waikiki Beach resort area and the Ala Moana business district are located.

Dillingham ventured onto the United States mainland in 1961 when it developed Tahoe Keys in Lake Tahoe.  Later it developed several prominent West Coast structures including the Wells Fargo Bank Building in San Francisco, De Anza College in Cupertino, and the Little Goose Lock and Dam in Washington State.  Over the years,

Dillingham performed work in Hawaii, California, the Southeastern region of the United States, and various international locations.

Prior to 1984 Dillingham operated as a diversified, publicly traded company involved in the construction of numerous large, diverse and sophisticated construction projects. DCHI was formed in 1987 by the senior management of Dillingham, together with a United States subsidiary of Shimizu Corporation ("Shimizu"), a major Japanese construction company, to purchase the stock of Dillingham from a company controlled by Kohlberg Kravis Roberts & Co. The employees of Dillingham, through an Employee Stock Ownership Plan ("ESOP"), acquired 45% of the stock of DCHI, senior management acquired 10%, and Shimizu acquired the remaining 45% of DCHI's shares.

In 2001 Shimizu sold all of its outstanding common stock in DCHI to members of management. As of the Petition Date, the employees of Dillingham, through the ESOP, owned approximately 45% of the outstanding stock of Dillingham, and members of management owned approximately 55%. As will be discussed in greater detail below, the Plan provides that the shareholders will receive nothing on account of their ownership interest in the Debtors.

2. Dillingham Construction, N.A.

In 1981 Dillingham formed DCNA and consolidated many of its mainland operations into that entity. DCNA was comprised of three operating divisions focused primarily in projects on the West Coast, although DCNA bid and constructed projects nationwide. DCNA was internationally recognized as one of the world's leading tunneling contractors.

3. Watkins Engineers & Constructors.

In 1983, Dillingham acquired WEC, which provided engineering, construction and industrial maintenance services in the southeast and midwest sections of the United States. Inland Industrial Construction, a sister company of WEC, acquired all of the outstanding stock of Construction Design, Inc. in 1997. CDI was an industrial contractor based in Kansas City and performed industrial maintenance. WEC, Inland, and

Case: 03-40516    Doc# 1043    Filed: 06/28/04    Entered: 06/28/04 16:20:18    Page 14
W02-SF:FKA\61403693.8                                                    DISCLOSURE STATEMENT

1  CDI operated the business commonly referred to as "Watkins Engineers" and will

2  hereinafter be referred to as "Watkins." Paclantic Construction, Inc. is the parent of WEC

3  and Inland.

4      4.    <u>Nielsen Dillingham Builders, Inc.</u>

5      In 1994, Dillingham transferred its commercial division of DCNA to a newly

6  formed subsidiary, Dillingham Builders, and also entered into a joint venture with Nielsen

7  Construction Company. In 1996, Dillingham exercised an option to acquire Nielsen's

8  interest in the joint venture, and Dillingham Builders then operated under the name Nielsen

9  Dillingham Builders, Inc.

10      NDBI was engaged in general building and construction of health care

11  facilities, higher education facilities, high tech facilities for the electronic and bio-med

12  industries, federal, state and country government buildings, retail complexes and office

13  buildings in California, Oregon, Nevada and Mexico. Acting as a general contractor,

14  NDBI managed construction projects, subcontracting nearly all of the physical

15  construction work.

16      On or about January 22, 2003, NDBI, DCC, FFIC and Roel Construction

17  Company, a California Corporation ("Roel") entered into an Asset Purchase Agreement

18  (the "Roel Agreement"). Under the Roel Agreement, Roel assumed obligations under

19  certain construction contracts with NDBI, while certain contract rights and receivables in

20  connection with such construction contracts were assigned by NDBI to Roel. In addition,

21  under the Roel Agreement NDBI agreed to make certain payments; however, as to certain

22  of those payments, FFIC reserved the right to exercise any of the rights or remedies of

23  NDBI so that the jobs that were assigned under the Roel Agreement could be completed.

24  Certain payments were made on or about January 22, 2003 by FFIC to Roel on behalf of

25  NDBI so that Roel would take the assignment of such contracts. A collateral account was

26  also established by FFIC under the Roel Agreement for the benefit of Roel. There were

27  also provisions in the Roel Agreement that FFIC may owe further moneys to Roel

28  depending on the performance on the jobs assigned.

W02-SF:FKA\61403693.8                        DISCLOSURE STATEMENT

1    5.    Dillingham Construction Pacific, Ltd.

2        Dillingham continued to operate in Hawaii through DCPL while other

3    Dillingham entities expanded throughout the United States.  DCPL was comprised of two

4    divisions:  (a) Hawaiian Bitumuls & Paving Company ("HB&P")  and (b) Hawaiian

5    Dredging Construction Company ("HDCC") .

6            a.    HB&P

7                (1)    General Background

8        Founded in 1930, HB&P manufactured hot mixed asphalt for contract paving

9    operations as well as for drive -up retail customers on the islands of Oahu, Maui, Hawaii

10   and Kauai.

11               (2)    Sale of HB&P

12       On or about June 12, 2001, DCPL, DCHI and Grace Pacific Corporation

13   ("Grace") entered into a Stock Purchase Agreement pursuant to which Grace purchased

14   HB&P for the gross purchase price of $12,305,000, subject to adjustment.  The sale

15   proceeds were used to pay down the loans from the Senior Secured Lenders.

16           b.    HDCC

17               (1)    General Background

18       Prior to the filing of these bankruptcy cases, HDCC was the largest

19   contractor in Hawaii with over 90 years of operating history.

20               (2)    Sale of DCPL

21       On or about October 31, 2002, substantially all of the assets of DCPL were

22   sold to Kajima USA, Inc. for the net purchase price of approximately $8 million.  All of

23   the net proceeds of the sale were paid to the Senior Secured Lenders on account of their

24   duly perfected security interest in the assets sold.

25   B.    Secured Lenders and Senior Debt

26   1.    The Senior Secured Lenders

27       Debtors and their affiliates entered into various credit agreements with the

28   Senior Noteholders (consisting of certain insurance companies discussed below), GMAC

Commercial Credit LLC, predecessor in interest to GMAC Commercial Finance LLC and Fireman's Fund Insurance Company. In the Plan and in this Disclosure Statement, GMAC CF and FFIC together, and as the successors and assigns of the Senior Noteholders, are referred to as the "Senior Secured Lenders." Each Debtor granted to the Senior Secured Lenders a security interest in substantially all of its assets for the advancement of moneys and credit. A brief description of the credit agreements with the Senior Secured Lenders follows.

2. <u>Senior Term Debt</u>

On or about June 13, 1997, DCHI issued $42,500,000 of 9.30% Series A Senior Secured Notes due March 31, 2004 (later amended and extended to December 31, 2005), and $2,500,000 of 9.54% Series B Senior Secured Notes due March 31, 2004 (later amended and extended to December 31, 2005) (collectively, the "Senior Secured Notes"), pursuant to Note Purchase Agreements with five insurance companies collectively referred to as the Senior Noteholders. The Senior Secured Notes are guaranteed by certain subsidiaries of DCHI, including each subsidiary Debtor, and secured by first priority liens encumbering substantially all of the assets of DCHI and each such subsidiary, including the stock of any entity owned by DCHI or any such subsidiary, which liens are shared with the working capital lender, GMAC CF, who also acts as collateral agent for the Senior Noteholders. The Senior Secured Notes are interest-only term notes, with interest payable monthly. The Senior Noteholders sold the Senior Notes to GMAC CF and FFIC prior to the Petition Date, and assigned all of their rights to the collateral securing the same as part of that transaction.

As of the Petition Date, the Debtors owed the Senior Noteholders approximately $27.5 million in connection with the Senior Notes.

3. <u>Working Capital Line of Credit</u>

GMAC CF was Debtors' working capital lender. On or about June 18, 1998, DCHI, DCC, DCNA, WEC, DCPL, NDBI, Inland, CDI, PC and DCO, together with certain non-Debtor affiliates, including Dillingham Construction International, Inc.

("DCII") and Dillingham International Capital Corporation ("Capital"), entered into a Loan and Security Agreement with GMAC CF's predecessor in interest, BNY Financial Corporation ("BNY"), under which BNY extended a credit line in the maximum principal amount of $50,000,000 (since reduced to a maximum principal amount of $41,354,080) (the "Credit Line"). Also pursuant to the Credit Line, GMAC CF as the account party caused to be issued standby letters of credit in the amount of $25,376,000 for Debtors' account to support certain obligations of DCII. The Credit Line is guaranteed by DCPBL and by certain other affiliates, and is secured by first priority liens encumbering substantially all of the assets of DCHI, DCC, DCNA, WEC, DCPL, NDBI, Inland, CDI, PC, DCO, DCII, Capital and Pakistan.

As of the Petition Date, the Debtors owed GMAC CF approximately $19 million in connection with the Credit Line.

4.    FFIC Credit Agreement and Bonds

FFIC and certain of its affiliates issued or agreed to issue surety bonds to one or more of DCHI, DCC, DCNA, WEC, DCPL, NDBI, DCPBL, Inland, CDI, PC and DCO, as well as certain non-Debtor affiliates, including DCII and Capital, pursuant to a General Indemnity Agreement dated June 11, 1987, as modified by a Surety Bond Facility and Amendment to Indemnity Agreement dated as of June 12, 2001 (the "Surety Bond Facility"). Obligations owing to FFIC under the Surety Bond Facility are secured by a senior lien (senior to the rights of GMAC CF and the Senior Noteholders) encumbering the contracts, accounts and equipment of each respective bonded job. In addition, FFIC, certain of its affiliates, or both, issued various other bonds for certain of the Debtors, including mechanics lien release bonds, retention release bonds, stop notice release bonds, supersedeas bonds, and bonds in connection with workers compensation obligations (all of the foregoing, collectively, the "Bonds").

In addition to the Bonds, FFIC extended a $40,000,000 term loan to DCHI, DCC, DCNA, DCPL, DCO, NDBI, PC, Inland, WEC and CDI, and to certain non-debtor affiliates, including DCII and Capital, pursuant to a Credit Agreement dated as of June 12,

2001 (the "FFIC Credit Agreement").  The obligations of Debtors and their affiliates under the FFIC Credit Agreement are secured by liens junior to those shared by GMAC CF and the Senior Noteholders encumbering substantially all of the assets of DCHI, DCC, DCNA, DCPL, Overseas, Nielsen, Paclantic, Inland, WEC, CDI and certain non-debtor affiliates of the foregoing, subject to FFIC's equitable subrogation rights.

As of the Petition Date, the Debtors owed FFIC approximately $78.5 million in connection with the Bonds and the FFIC Credit Agreement.

C.     Cash Management System

Debtors employed a cash management system for the collection, concentration, management, and disbursement of funds.  Each Debtor deposited its receipts with a local bank and all such receipts were forwarded to DCHI pursuant to a special account agreement with GMAC CF.  That account agreement required the daily wire transfer of all collected funds in DCHI's account to an account designated and controlled by GMAC CF.  Those wired funds were used to pay down DCHI's outstanding loan balance to GMAC CF.  When a Debtor required funds, GMAC CF advanced those funds to DCHI under the Credit Line, and DCHI transferred those funds to the particular Debtor requesting the funds.  In summary, on a regular (almost daily) basis all deposits flowed from Debtors' accounts to GMAC CF and were applied to pay down DCHI's obligation to GMAC CF under the Credit Line, and all requests for funds flowed through DCHI to the specific Debtor in need of the funds.

D.     Events Leading to the Filing of the Reorganization Cases

Between 1993 and 1997, Debtors expanded their international and commercial construction operations.  In connection with that expansion, DCNA and DCII incurred significant losses on a project in Singapore, and DCNA incurred significant losses on the Hyperion Waste Water Plant in Los Angeles and on the Olmstead Locks on the Ohio River Project in Olmstead, Illinois.  A series of construction projects contracted by NDBI suffered further losses which totaled in excess of $20 million.  In addition, owners

of construction projects in which Debtors were the general contractors asserted significant claims against Debtors and withheld payments totaling tens of millions of dollars.

In 1996 the Debtors' co-founder and long-time chief executive officer retired and was replaced by a new chief executive officer who decided to expand Debtors' businesses internationally. Unfortunately, the downturn in the overall Asian economy at about the same time proved to be devastating for Debtors. The burden of Debtors' mounting losses was increased by interest charges and legal costs expended in pursuing claims on certain projects. Those losses weakened Debtors, notwithstanding the profitability of projects in other areas. In 1998, senior management was replaced by a new chief executive officer who commenced a reorganization of Debtors by discontinuing new international operations and discontinuing new jobs in the area of heavy civil construction. However, by 2001, Debtors continued to face significant economic problems and decisions were subsequently made to sell HB&P and HDCC in Hawaii in order to improve Debtors' financial situation. In 2001, Debtors borrowed $40 million from FFIC in order to fund continued operations. Losses at NDBI and Watkins continued through 2002 and on January 28, 2003, after the Senior Secured Lenders refused to advance further funding, Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

IV.

MAJOR EVENTS DURING THE REORGANIZATION CASES

A.      General Summary

Prior to filing these Cases, Debtors engaged in workout discussions with their Senior Secured Lenders which contemplated the filing of a chapter 11 plan of reorganization under which WEC, Inland, CDI, and DCNA would survive and emerge as reorganized debtors. In anticipation of such a filing and in the months prior to the Petition Date, certain of the operations of NDBI and DCPL were offered for sale and such sales closed prior to the filing of the Cases.

Debtors believed the sales of NDBI and DCPL would facilitate an orderly chapter 11 plan process and allow WEC, Inland, CDI and DCNA to reorganize and

continue business operations.  The parties discussed potential plans under which the Senior Secured Lenders would take common stock for their claims and finance the surviving entities.

Shortly before the filing of the Cases, the Senior Secured Lenders informed Debtors that the Senior Secured Lenders would not advance additional funds for certain of DCNA's continuing operations.  Accordingly, without the ability to use cash collateral, DCNA discontinued its non-bonded operations on the Petition Date, January 28, 2003.

B.    Debtor-in-Possession Financing and the Use of Cash Collateral

At the time of the filing of the Cases, a critical need existed for Debtors to obtain funds in order to continue the operation of certain portions of their businesses, meet their payroll and other ordinary course business expenditures, acquire goods and services, and administer and preserve the value of their estates.  Debtors thus sought debtor-in-possession financing from the Senior Secured Lenders in order to fund, among other things, the continued operations of Watkins.

On January 30, 2003 the Court entered its "Interim Order (I) Authorizing DIP Financing, (II) Authorizing Use Of Cash Collateral, (III) Granting Liens And Priorities, (IV) Modifying The Automatic Stay, And (V) Providing Related Relief" (the "DIP Order").  The DIP Order provided Debtors with the funding required to continue the operations of Watkins and other Debtors on bonded jobs, established a restricted collateral account for the payment of both pre- and post-petition subcontractors and vendors on bonded jobs, provided funds to facilitate the sale of assets, and facilitated the orderly liquidation of certain of Debtors' businesses.  The DIP Order also provided for an initial two-week budget pending further discussions between Debtors and the Senior Secured Lenders regarding whether the Senior Secured Lenders would support Debtors' long-term plan for the survival of the Watkins entities.

During the course of the Cases various amounts were advanced by GMAC CF and FFIC under the DIP Order, as supplemented from time to time (the "DIP Facility").  The amount due and owing to GMAC CF and FFIC by Debtors under the DIP Facility as

of the date of this Disclosure Statement is $21,476,392. During the course of the Cases assets were sold and some payments were made on both the DIP Facility and on the prepetition secured loans of the Senior Secured Lenders. Following are the amounts that Debtors believe were due as of the Petition Date, which include interest for the prepetition amounts due through the Petition Date, and no accrual of interest thereafter. Also, following are the amounts Debtors feel are due as of the date of this Disclosure Statement on such prepetition loans:

|  | GMAC CF | Senior Notes | FFIC |
|---|---|---|---|
| Prepetition Amounts Due: | 19,054,000 | 27,559,000 | 78,535,000 |
| Due as of Disclosure Statement Date: | 17,094,000 | 27,559,000 | 78,535,000 |

C.      Administrative and Early Case Orders

On January 30, 2003, the Court entered its order authorizing Debtors to honor certain prepetition priority obligations to employees. On February 1, 2003, the Court entered its orders permitting the joint administration of the Cases for procedural purposes only. On February 3, 2003, the Court entered its order designating Donald E. Sundgren as Debtors' responsible individual and subsequently entered its order on April 17, 2003 changing that designation to replace Mr. Sundgren with Larry Magelitz as responsible individual.

D.      Appointment and Role of Committees of Unsecured Creditors

On or about February 3, 2003, the United States Trustee appointed the following members of a creditors' committee:  Borton, LC; Triad Electric & Controls, Inc.; Brooks Welding, Inc.; Hertz Equipment Rental Corp.; Mid States Supply Co., Inc.; Dunmore Roofing & Supply Co., Inc.; Insco Industries, Inc.; Reintjes & Hier Co., Inc.; and Advanced Protective Coating, Inc. The United States Trustee subsequently appointed separate committees for WEC, Inland and CDI by dividing the appointed committee members.

The Committees supported the efforts of WEC and Inland to reorganize their businesses at the outset of the cases. When the Senior Secured Lenders refused further

1  funding for the continued business operation of WEC and Inland, the Committees

2  continued to play an active role in the WEC, Inland and CDI cases, objecting to certain

3  terms and conditions of Debtors' proposed use of cash collateral and financing,[2] actively

4  participating in Debtors' negotiations to sell the assets of CDI and certain of the combined

5  assets of WEC and Inland, reviewing and objecting to certain provisions of Debtors' sale

6  of other assets in the WEC estate, participating in Debtors' negotiations with project

7  owners on various jobs to pay subcontractors and vendors on specific projects, and

8  reviewing and monitoring various other motions, stipulations and proceedings in the cases.

9  Where appropriate or necessary, the Committees also appeared in the other Debtor cases as

10 a party in interest. The Committees' efforts have resulted in substantial payments to the

11 unsecured creditors in the WEC, Inland and CDI cases, and to creditors in the other Debtor

12 cases.

13      Upon the closing of the CDI transaction, Debtors and the Committees

14 believe that all of the unsecured creditors of CDI were paid in full. For this reason, the

15 members of the Committee for CDI resigned and the CDI Committee was disbanded. In

16 addition, during the course of the cases, the following members of the WEC and Inland

17 Committees have been paid in full from bonds issued in connection with Debtors' projects

18 or from other third parties: Borton, LC; Brooks Welding, Inc.; Mid States Supply Co., Inc.

19 and Dunmore Roofing & Supply Co., Inc.; leaving Triad Electric & Controls, Inc. and

20 Hertz Equipment Rental Corp. as the only remaining original members. The United States

21 Trustee has since appointed BC Industrial Supply, Inc. to the WEC Committee. Based on

22 the expanded role assigned to the Committees in the post-confirmation administration of

23 the Cases, the Plan provides that the Committees shall be consolidated into a single

24 Committee.

25

26 _____

27    [2] The initial order approving Debtors' emergency use of cash collateral and
   financing was entered by the Court prior to the appointment of the Committees.

28

W02-SF:FKA\61403693.8                                    DISCLOSURE STATEMENT

Despite their active role, the Committees in many instances have been forced to rely on information supplied by and the business judgment of Debtors, when reviewing and responding to the various motions, stipulations, and other requests that have been filed in these cases. This was in large part due to the limited funding made available.

The Committees have met and conferred extensively with Debtors, FFIC and GMAC CF regarding the matters contained in the Disclosure Statement and Plan, and the Committees have performed certain due diligence in regard to the Plan, including reviewing Debtors' schedules and statements of financial affairs, Debtors' various loan and security documents, the claims matrices for the 11 cases, Debtors' summary of payments to creditors within the preference period, and certain other documents or financial information. The Committees also have required Debtors to amend their Disclosure Statement to provide additional financial disclosure to creditors regarding the key aspects of the Plan, and they have attempted to negotiate certain amendments to the Plan to serve the best interests of the general unsecured creditors of WEC and Inland.

The Committees have not yet performed an analysis of the unsecured claims or the possible preference actions in the cases. The Committees have not propounded formal discovery or examined Debtors under oath, apart from questioning at the initial meeting of creditors convened by the United States Trustee, regarding Debtors' business operations and financial condition, and the remaining assets to be liquidated under the Plan.

E.    Shift in Focus From Reorganization to Liquidation

With the exception of bonded jobs, the Senior Secured Lenders refused further funding for the continuing operations of Watkins in mid-February 2003. In order to avoid a complete shut-down, Debtors scrambled to locate purchasers for the businesses of the Watkins entities, either separately or as a whole. Debtors reached agreements in a matter of weeks with a purchaser for substantially all of the assets of CDI, and found another purchaser, Fru-Con Construction Corporation ("Fru-Con"), for certain of the combined assets of WEC and Inland. Both transactions involved (i) the sale of assets

($500,000 purchase price for CDI and $1.5 million purchase price for WEC and Inland), (ii) the assumption by Debtors and assignment to the respective purchaser of certain contracts and leases, (iii) the assumption by the purchasers of significant trade payables and liabilities, (iv) purchasers' continued employment of most of Debtors' former employees, and (v) purchasers' completion of certain projects that had not been completed. Debtors believe that the CDI transaction provided for that purchaser's payment of all of CDI's general unsecured creditors in full.

As a result of the WEC and Inland sale to Fru-Con, major construction projects continued without serious interruption, which in turn benefited creditors, project owners and certain of Watkins' employees. Debtors estimate that Fru-Con assumed liability for significant trade payables to subcontractors and vendors, and provided for unpaid union dues relating to hourly employees on the jobs it took over, for an additional total benefit to WEC and Inland's creditors of in excess of $1 million.

At the same time that Debtors negotiated and closed the above sales, Debtors worked with FFIC to minimize damage on bonded jobs. To that end, Debtors continued to serve as general contractors on a majority of the FFIC bonded jobs, and coordinated with completion contractors on other jobs as necessary.

In addition to retaining general insolvency counsel, Debtors obtained authority to employ various law firms and attorneys as special counsel in order to pursue valuable claims on behalf of Debtors in non-bankruptcy matters that were pending prior to the Petition Date. During the Cases, Debtors reached compromises in nearly a dozen of those matters, resulting in settlement payments to Debtors in a net amount exceeding $2 million.

In addition to the sale of the business of CDI and portions of the businesses of WEC and Inland, Debtors sold certain smaller lots of vehicles, tools and equipment (those with book values of less than $300,000 per lot) on an ongoing basis beginning in early March 2003. Those asset sales generated approximately $2.4 million in sales

proceeds. Debtors also sold certain larger assets, such as heavy industrial cranes and an aircraft owned by Debtors, for in excess of $900,000.

In September 2002, Debtors auctioned a parcel of real property commonly referred to as the "Napa Yard" and all of the Debtors' personal property located therein. The winning bid was submitted by The Carter Family Trust for $8.8 million, subject to adjustment. The net amount was paid to the Senior Secured Lenders, less an amount set aside pending a determination regarding the nature and extent of a Claim of the Napa County Flood Control and Water Conservation District, the amount of which remains in dispute. Any additional amount collected by Debtors, the Senior Secured Lenders or the Liquidating Trust in connection with such dispute shall be paid to GMAC CF, subject to any payment to be made to the Liquidating Trust pursuant to the Plan, and subject to its disposition as part of the Receivable Recoveries and FFIC's prior rights of equitable subrogation.

In addition to the various sales and the payments that resulted from settlements of disputed claims against third parties, Debtors entered into stipulations with certain project owners which provided for: (i) the release of significant claims against Debtors, (ii) termination of contracts Debtors could not complete, (iii) payment by the project owner to subcontractors and vendors, (iv) and payment of remaining funds to Debtors for work performed prior to the Petition Date. Those project owners included: Metcalf Energy Center, LLC; the City of San Mateo; Proctor & Gamble; Kerr-McGee Chemical, LLC; Seminole Electric Cooperative, Inc.; Iluka Resources, Inc.; Packaging Corporation of America; Florida Power & Light Company; Merck & Co., Inc.; and Shell Oil Products, U.S. The payments to Debtors as a result of those stipulations totaled over $2 million.

As a result of (1) payments on bonded jobs through Debtors' restricted collateral account, (2) payments by project owners pursuant to Court-approved stipulations, and (3) payments by purchasers of certain of Debtors' businesses, Debtors believe that a substantial number of unsecured creditors were paid in full.

F.      Claims Bar Date

      1.      Prepetition Claims

         The deadline for filing claims arising before the Petition Date was (a) July 7, 2003 for all claims other than the claims of governmental units or claims arising from the rejection of executory contracts, and (b) July 28, 2003 for claims of governmental units. The claims of creditors filed after these bar dates who are not otherwise treated as having valid claims, will not be allowed.

      2.      Other Claims

         Certain claims arising after the Petition Date are entitled to full payment and are treated as Administrative Expenses under the Plan.  To the extent an Administrative Expense is not paid in full on the Effective Date of the Plan and is disputed, a cash reserve shall be made for such Claim unless the holder of the Administrative Expense Claim agrees to a different treatment.

G.      Professional Fees and Costs

         Debtors have retained the following professionals pursuant to the following Court orders: (1) Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin"), as Debtors' counsel, pursuant to the Court's order entered February 13, 2003, (2) Gray Cary Ware & Freidenrich LLP ("Gray Cary"), as former counsel for the Creditors' Committees, pursuant to the Court's order entered March 8, 2003, and (3) Sedgwick, Detert, Moran & Arnold LLP ("Sedgwick"), as counsel for the Creditors' Committees in place of Gray Cary, pursuant to the Court's order entered November 7, 2003.

         By an order entered July 21, 2003, the Court approved the first interim fee applications of the following professionals in the following amounts: (1) fees and expenses of Sheppard Mullin in the amount of $705,000, and (2) fees and expenses of Gray Cary in the amount of $100,000.

         By orders entered September 15, 2003, the Court approved the second interim fee applications of the following professionals in the following amounts: (1) fees

and expenses of Sheppard Mullin in the amount of $385,000, and (2) fees and expenses of Gray Cary in the amount of $41,165.28.

By an order filed December 18, 2003, the Court approved the third interim fee applications of the following professionals in the following amounts: (1) the fees and expenses of Sheppard Mullin in the amount of $330,000, and (2) the final fee application of Gray Cary in the total amount of $144,100.80 that previously had been allowed and paid on an interim basis, and, in addition, granted final approval and authority for Gray Cary to be paid an additional $14,506.92 for its unpaid fees and expenses through November 26, 2003. In addition, by order dated January 15, 2004, the Court approved the first interim application of Sedgwick, Detert, Moran & Arnold LLP (new Committee Counsel) in the amount of $3,873.00.

In addition, the Court authorized Debtors to request payment to Sheppard Mullin of $64,218.50 in fees related to the Debtors' pension plan from the assets of the pension plan, and further authorized Sheppard Mullin to receive such amounts.

Final requests by Debtors' Counsel and counsel for the Creditors' Committees for fees and costs incurred after the Petition Date but before the Effective Date will be determined by order of the Court after the Confirmation Date.

In addition, the Court authorized Debtors to retain special counsel to represent Debtors in non-bankruptcy matters that were pending as of the Petition Date and in matters where potential conflicts of interest were identified.

H.     Statements of Financial Affairs and Schedules of Assets and Liabilities

In April and May 2003, Debtors filed their respective Statements of Financial Affairs and Schedules of Assets and Liabilities (the "Schedules and Statements"). Those documents, and amendments to those documents, are on file with the clerk of the Court and are available for review during the clerk of the Court's normal business hours.

I.     <u>Orders Authorizing Asset Sales</u>

    The Debtors sought and obtained orders authorizing six significant asset sales during the course of the Cases, as detailed above.

V.

**DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN**

A.     <u>Summary of Plan</u>

    The Plan contemplates (a) the transfer of substantially all of Debtors' assets to the Senior Secured Lenders in which they hold duly perfected liens, in exchange for the execution of full mutual releases between those parties, (b) the creation of a Liquidating Trust to administer all assets transferred to it for distribution as set forth in the Plan, including cash and rights to recover certain preferential transfers and other avoidance actions, and 7.2% of certain defined receivables owing to the Debtors, subject to FFIC's prior rights of equitable subrogation, (c) the initial funding of the trust by the Senior Secured Lenders, (d) payment in full or as otherwise negotiated of all Allowed Administrative Expenses, Priority Claims and Priority Tax Claims, and (e) the payment to general unsecured creditors from the remaining assets in the Liquidating Trust.

    The Senior Secured Lenders are owed approximately $144.5 million in connection with their pre- and post-petition loans to Debtors. Debtors believe that the assets being transferred to the Senior Secured Lenders pursuant to the Plan are insufficient to pay off that balance and that even under the best of circumstances the shortfall will be significant.

B.     <u>Support for Plan</u>

    Debtors current intention is to enter into a lock-up agreement with the Senior Secured Lenders following the Court's approval of this Disclosure Statement. That lock-up agreement will provide that the Senior Secured Lenders shall vote any and all of their respective claims in favor of the Plan and will not change their vote, subject to certain conditions (the "Lock-up Agreement"). The Lock-up Agreement will not be considered or

executed until the Court approves the Disclosure Statement and a ballot is tendered to the Senior Secured Lenders with the Plan package.

The Lock-up Agreement further will provide that between the date of the approval of the Disclosure Statement and the Effective Date the Senior Secured Lenders will approve reasonable budgets for administrative expenses of Debtors, so that the Plan may be considered by creditors and then become effective if the appropriate vote is obtained, and Confirmation Order entered.

After approval of the Disclosure Statement the Court approved a motion by Debtors to abandon the capital stock of DCII. The order approving such abandonment only authorized Debtors to abandon such stock. Debtors only intend to abandon such stock when they are satisfied that any post-petition taxes based upon or measured by income owing to the Internal Revenue Service or any state taxing entity that are found to be due by Debtors are paid or satisfied.

C.    Sources of Creditor Payments Under the Plan

1.    Establishment of the Liquidating Trust

On the Effective Date, a Liquidating Trust will be established as an express trust and a separate legal entity governed by the terms of the Liquidating Trust Agreement. Except to the extent required otherwise under applicable tax law or as Debtor and Liquidating Trustee may agree as set forth in the Liquidating Trust Agreement, the holders of Claims hereunder shall be treated as the grantors of the Liquidating Trust and deemed to be owners of the Liquidating Trust's assets for income tax purposes. If any term of the Liquidating Trust Agreement is inconsistent with the Plan or the Confirmation Order, the terms of the Plan and the Confirmation Order will control the contrary terms of the Liquidating Trust Agreement.

The holders of all Allowed Claims (exclusive of the Senior Secured Lenders), are the beneficiaries of the Liquidating Trust, which will be the only source for repayment of Claims in accordance with the Plan. The Liquidating Trustee will serve as the sole trustee of the Liquidating Trust, and the Committees may act as advisors to the

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 30 of 55
W02-SF:FKA\61403693.8                                    DISCLOSURE STATEMENT

Liquidating Trustee in accordance with the Liquidating Trust Agreement. After the Liquidating Trust has been completely administered and all distributions have been made to the holders of Allowed Claims, as provided in the Plan, and all other conditions to termination of the Liquidating Trust under the Liquidating Trust Agreement have been satisfied, the Liquidating Trust will be terminated prior to the entry of the final decree and order closing the chapter 11 Cases.

2.    Funding of the Liquidating Trust

The funds required for the implementation of the Plan and the distributions hereunder shall be provided solely from the Liquidating Trust. On the Effective Date, and in order partially to fund the Liquidating Trust, the Senior Secured Lenders shall contribute proceeds from their cash collateral or, in the absence of such cash collateral, Cash to the Liquidating Trust in the sum of $200,000. The percentage contribution to be made by the Senior Secured Lenders shall be 50% each.

In addition to that contribution, the Senior Secured Lenders shall contribute funds to the Liquidating Trust equal to the amount of Allowed Administrative Expenses, Allowed Priority Tax Claims and Allowed Priority Claims. Further, the Senior Secured Lenders will establish a segregated account and fund that account in an amount sufficient to pay all of the Disputed Administrative Expenses, Disputed Priority Tax Claims and Disputed Priority Claims. Notwithstanding the foregoing and as set forth in the Lock-Up Agreement, if the total amount of the Administrative Expenses (excluding, however, allowed professional fees, expenses of Debtors' bankruptcy counsel and Committees' counsel and taxes that are Administrative Expenses), Priority Tax Claims and Priority Claims (both Allowed and Disputed) exceeds $1,000,000, GMAC CF, FFIC, or both, may withdraw their support for the Plan by notifying Debtors' Counsel in writing of such withdrawal at any time prior to the Effective Date and at that time Debtors will withdraw the Plan.

Furthermore, GMAC CF shall contribute funds to the Liquidating Trust in an amount equal to 7.2% of the net Receivable Recoveries, subject to the equitable

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 31 of 55

subrogation rights of FFIC.  The net amount of the Receivable Recoveries shall be calculated by starting with the gross amount received by GMAC CF from the Receivable Recoveries and deducting therefrom all of the attorney fees, accountant fees, expert witness fees, costs, court costs and expenses directly attributable to any action or proceeding necessary to effect the Receivable Recoveries.  Said payment shall be made by GMAC CF to the Liquidating Trust within thirty (30) days after receipt of any Receivable Recoveries.  GMAC CF shall provide periodic status reports to the Liquidating Trustee regarding GMAC CF's efforts to collect the Receivable Recoveries and provide an accounting of any gross amounts received and any deductions taken by GMAC CF.

The Receivable Recoveries include actions pending or that may be filed related to certain jobs and against certain entities as follows: "Receivable Recoveries" means the amount received by GMAC CF from the following of Debtors' accounts receivable, causes of action or claims on which a security interest has been granted to the Senior Secured Lenders, and which are to be distributed to GMAC CF pursuant to the Plan: (1) all interests of Debtors to that portion of the Dillingham-Ray Wilson Joint Venture arising out of a contract with the City of Los Angeles for the Hyperion Solids Handling C-74d1 Digester Expansion Phase I, and all rights of Debtors related to those interests (the "Hyperion Matter"), (2) all claims and rights of Debtors in connection with Debtors' construction of a cement manufacturing line in Midlothian, Texas, for Holcim (Texas) Limited Partnership, fka Holnam Texas Limited Partnership, including all claims and rights against Humboldt Wedag, Inc. and Triad Electric & Controls, Inc. (the "Holcim Matter"), (3) all interests of Debtors to the joint venture with The Lane Construction Corporation for the bidding and construction of improvements for the Olmstead Locks on the Ohio River in Olmstead, Illinois (the "Olmstead Matter"), (4) all claims and rights of Debtors in connection with the Libertyville micro-tunneling project (the "Libertyville Matter"), (5) all interests of Debtors to the Parsons-Dillingham Metrorail Joint Venture, including all claims and rights relating to any litigation or actions arising from those interests (the "MTA Matter"), subject to such claims and defenses as may be asserted by

parties other than Debtors, (6) any funds being held in escrow arising from the Napa Valley EPA Project (the "Napa Dispute"), and (7) the proceeds from the sales of equipment from the Olmstead project. The Receivable Recoveries shall be subject to FFIC's prior rights of equitable subrogation. Those actions have been or will be funded by GMAC CF, as it and FFIC hold duly perfected liens on any recoveries from those actions that would otherwise accrue to the benefit of Debtors.

Debtors have demanded the following approximate amounts in connection with their claims and interests in the litigation regarding the above matters: (1) Hyperion Matter - $33 million; (2) Holcim Matter - $3.4 million; (3) Olmstead Matter - $1.2 million; (4) Libertyville Matter - $900,000; and (5) MTA Matter - $3.4 million. In addition, the Napa Dispute involves the disposition of $700,000 being held in escrow as a result of Debtors' sale of the Napa Yard. The proceeds of the sale of equipment regarding the Olmstead project are factored into the figure for the Olmstead Matter.

The defendants in the various lawsuits related to the Receivable Recoveries dispute liability and reserve all rights to defend, counterclaim and offset against claims brought by Debtors. The use of the term "Receivable Recoveries" is descriptive only and is not meant to infer that the receivables will be paid as there is no certainty in those litigation actions.

Finally, certain Avoidance Actions (those not otherwise transferred to the Senior Secured Lenders) will be transferred on the Effective Date to the Liquidating Trust.

Under the Bankruptcy Code, if a transfer was made to or for the benefit of a creditor on account of an antecedent debt while the debtor was insolvent and within ninety days of the filing of the debtor's bankruptcy petition, the Bankruptcy Code allows the recovery of these preferential transfers for the benefit of the estate, subject to certain defenses.

To that end, Debtors have reviewed the Avoidance Actions considered to be possible preference recoveries against transferees that received payment within the ninety days preceding the Petition Date. Those claims are being transferred to the Liquidating

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 33 of 55

1   Trust and are not being transferred to the Senior Secured Lenders.  The Liquidating

2   Trustee, in its discretion, will pursue the Avoidance Actions that the Liquidating Trustee

3   believes are recoverable, and the proceeds will be deposited in the Liquidating Trust for

4   the benefit of creditors.

5   D.     Litigation

6          Debtors have listed in their respective Schedules and Statement of Financial

7   Affairs on file in each Case all of the litigation that was pending by them as of the Petition

8   Date.  On the Effective Date and except as otherwise provided in the Plan, the right to

9   pursue all of that litigation shall pass to the Liquidating Trust.  Debtors reserve the rights

10  to pursue or have the Liquidating Trust pursue all of that listed litigation.  Debtors have

11  described in this Disclosure Statement the Receivable Recoveries that also consist in part

12  of certain litigation.  Debtors preserve the right to have the Liquidating Trust pursue all

13  such matters.

14         There are substantial preference recoveries that the Debtors are entitled to

15  pursue.  A preference is described in the Bankruptcy Code and anyone with questions

16  regarding preferences should consult their bankruptcy counsel.  A preference is a transfer

17  for or on account of an antecedent debt made within ninety days of the filing of the petition

18  to non insiders, and within a year to insiders.  During the ninety days prior to the

19  bankruptcy filing, Debtors transferred approximately $75 million to third parties.

20  Additional sums were transferred to insiders within the year prior to the bankruptcy.

21  Neither Debtors, nor the Committees, have performed a complete analysis of the possible

22  preference actions.  All preference claims are preserved for FFIC, GMAC CF and the

23  Liquidating Trust.  FFIC is receiving certain avoidance claims and the Liquidating Trust is

24  assigned the remaining avoidance claims.  Debtors do not want to burden this Disclosure

25  Statement with a listing of all potential preference claims.  If a party obtained a payment

26  within the time periods described herein, that party may be sued for a preference.  Also,

27  the receipt of a preference may be used as a defense to the payment of a claim that is filed.

28  Any party that wants to see who the Debtors listed as receiving payments within these time

periods may check the Schedules and Statement of Financial Affairs on file in the Cases which list various payments made in these time periods.

E.  Employment and Compensation of Liquidating Trustee and Its Professionals.

As of the date of the writing of the Disclosure Statement, the terms of employment and compensation of the Liquidating Trustee and its professionals have not been negotiated.  At least ten days prior to the commencement of the Confirmation Hearing, Debtors shall suggest to the Committees the name of the Liquidating Trustee. Debtors and the Committees shall meet and confer regarding that suggestion.  If they cannot agree on a Liquidating Trustee, then during the Confirmation Hearing the names of the proposed Liquidating Trustee shall be submitted to the bankruptcy judge presiding at the Confirmation Hearing, along with background materials regarding those proposed candidates.  The bankruptcy judge shall select the Liquidating Trustee that such judge determines will best serve as Liquidating Trustee.  Parties may contact Debtors' Counsel prior to the Confirmation Hearing in order to request information regarding the selection of the Liquidating Trustee and its terms of employment and compensation.

The Liquidating Trustee's compensation and permitted expenses shall be paid solely from the Liquidating Trust Assets.  From time to time after the Effective Date, the Liquidating Trustee may employ, engage the services of, and compensate other Persons and Professional Persons (which may include Professionals previously or concurrently employed by the Committee or previously employed by Debtors), reasonably necessary to assist the Liquidating Trustee in performing its duties under the Liquidating Trust Agreement, and the Plan, without the necessity of further authorizations by the Court. Prior to employing any such Professional Persons the Liquidating Trustee will give notice of its intent to employ to the Committees and the Office of the United States Trustee.  Such notice will include a description of the work to be performed, the anticipated fees and costs to be incurred and the financial terms of the proposed engagement.  The Committees and the Office of the United States Trustee shall have 15 days to object in writing to the proposed engagement.  To the extent that the parties cannot resolve any dispute regarding

such employment, the Liquidating Trustee may move the Court to approve the engagement on 15 days' notice to the Committees and the Office of the United States Trustee. The Estates shall compensate the Liquidating Trustee's Professional Persons in accordance with the procedures set forth in the Liquidating Trust Agreement and solely from the Liquidating Trust Assets.

F.      Specification and Treatment of Claims and Interests

The treatment of Claims described below applies only to Allowed Claims. Disputed Claims or Claims subject to Bankruptcy Court review or approval (such as requests for payment of professional fees) will be paid only after they become Allowed Claims.

1.      Unclassified Claims.

a.      Administrative Expenses.

(1)     Payment of Administrative Expense Claims.

Except to the extent the holder of an Allowed Administrative Expense Claim agrees otherwise, each holder of an Allowed Administrative Expense Claim shall be paid the full amount of the Claim, without interest, in Cash, as soon as practicable after the later of (i) the Effective Date, or (ii) the date on which such Claim becomes an Allowed Claim. To the extent an Administrative Expense Claim is not paid in full on the Effective Date of the Plan and is disputed, a full cash reserve shall be made for such Claim unless the holder of the Administrative Expense Claim agrees to a different treatment or the Court orders a different treatment. Claims for professional fees and expenses pursuant to Bankruptcy Code § 330 shall be paid only upon order of the Court. The Senior Secured Lenders shall pay or provide for all allowed fees and expenses of Court-approved professionals through the Effective Date of the Plan.

During these chapter 11 cases, Debtors have stayed current with their ordinary monthly operating expenses. Debtors, through their counsel, have also conducted a preliminary review of administrative claims filed in response to the Bankruptcy Court's order fixing a claims bar date for filing claims for unpaid administrative expense claims.

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 36
W02-SF:FKA\61403693.8                                          DISCLOSURE STATEMENT

That review indicates that although administrative claims in significant numbers were filed, and except as otherwise set forth above, no significant valid administrative claims remain unpaid. A number of claims have been filed by parties as Administrative Expenses in connection with Debtors' projects and jobs that are bonded by FFIC. Debtors and FFIC reserve all defenses to such claims. At the Confirmation Hearing, Debtors will prove that FFIC will pay or provide for all such claims to the extent such claims are Allowed Administrative Expenses on Debtors' bonded projects and jobs. To the extent an Allowed Administrative Expense Claim arose or arises in connection with a construction project or job of Debtors and FFIC provided a bond for such project or job, FFIC shall pay in full, or provide for the payment in full of, that Allowed Administrative Expense Claim.

(2)     Statutory Fees.

Allowed Administrative Expenses for any fees and charges payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) shall be paid in Cash as such fees are due equal to the amount of such Administrative Expenses. These fees will continue to be paid until entry of a final decree closing these bankruptcy cases.

b.     Priority Tax Claims.

Each holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Claim at the discretion of the Liquidating Trustee (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim; (b) such lesser amount as the holder of an Allowed Priority Tax Claim and Debtors might otherwise agree to on or before the Effective Date; (c) such lesser amount as the holder of an Allowed Priority Tax Claim and the Liquidating Trustee might otherwise agree to after the Effective Date; or (d) over a period of time as allowed by the Bankruptcy Code. A review of Debtors' Schedules and a preliminary analysis of timely filed claims indicates there are in excess of $433,000 of Priority Tax Claims. However, Debtors have not reviewed each and every claim included in this amount, nor have they reconciled all these timely claims to their books and records. As such, objections may be filed to some of

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 37

these claims and nothing herein may be deemed an admission as to the allowability of any priority tax claim herein.

2. Classified Claims.

a. Class 1 – Priority Claims:  Allowed Class 1 Claims are Unimpaired.

Unless it agrees to receive other, less favorable treatment, each holder of an Allowed Priority Claim will be paid 100% of the unpaid amount of the Allowed Priority Claim in Cash on, or as soon as reasonably practicable after, the later of (a) the Effective Date, and (b) the date the Priority Claim becomes an Allowed Priority Claim.  The holders of Claims in this Class are not impaired and thus are not entitled to vote on the Plan.  The priority claims filed herein consist mainly of alleged unpaid vacation, benefits, union dues and other benefits.  These claims total in excess of $180,000, but many may exceed statutory maximums for allowance.

b. Class 2 – GMAC CF.

GMACCF holds a duly perfected secured claim and is owed approximately $17 million.  On the Effective Date, GMAC CF shall receive, in full and complete satisfaction of any and all of its Claims of whatever nature herein, and unless otherwise previously received by GMAC CF, the common stock of DCII, the GMAC CF Avoidance Actions set forth on Exhibit B to the Plan, and those other assets identified as being distributed to GMAC CF in Exhibit C to the Plan.  On the Effective Date, Debtors, the Committees and GMAC CF shall enter into full and complete mutual releases based on the language set forth in Exhibit D to the Plan, and GMAC CF shall withdraw all Claims against Debtors and the Estates.  In addition, at or before the time of transfer of the DCII stock, Debtors and GMAC CF shall enter into an agreement in connection with the foregoing on terms and conditions mutually acceptable to them and (i) providing that, if Debtors so elect, the common stock of DCII shall be transferred to a new corporation wholly owned by GMAC CF and that Debtors and such new corporation shall make an election under § 338(h)(10) of the Internal Revenue Code of 1986, as amended (and corresponding state and local tax law) with respect to such transfer, (ii) setting forth the

fair market value of the common stock of DCII and that transfer thereof to GMAC CF shall be considered a payment by Debtors to GMAC CF on funded indebtedness owed by Debtors to GMAC CF, and (iii) stipulating that the GMAC CF Avoidance Actions and the other actions, not identified as going to FFIC, set forth in Exhibit C to the Plan, and including without limitation the causes of action and claims related to any potential Receivables Recoveries, are causes of action that are contingent, and have no ascertainable fair market value for income tax purposes as of the Effective Date. Such agreement shall not be binding on the Internal Revenue Service.

### c.     Class 3 – FFIC.

FFIC holds a duly perfected secured claim and is owed approximately $78.5 million by Debtors, not including amounts owed in connection with its significant post-petition financing. On the Effective Date, FFIC shall receive, in full and complete satisfaction of any and all of its Claims of whatever nature herein, the FFIC Avoidance Actions set forth on Exhibit A to the Plan, and those other assets identified as being distributed to FFIC in Exhibit C to the Plan.

Debtors' preliminary review suggests that the FFIC Avoidance Actions consist of potential preference actions and claims against transferees that received payment in connection with jobs bonded by FFIC within the ninety days preceding the Petition Date. The potential preference payments in the ninety day period prior to the Petition Date total approximately $75 million as set forth in Debtors' Schedules and Statements of Financial Affairs on file in the Cases. Of those payments, approximately $30 million comprise the FFIC Avoidance Actions based on Debtors' best estimates. As discussed in the Liquidation Analysis below, Debtors believe the transfer of the FFIC Avoidance Actions to FFIC benefits all creditors under the conditions set forth in the Plan.

In addition to the above, on the Effective Date, Debtors, the Committees and FFIC shall enter into full and complete mutual releases based on the language set forth in Exhibit D to the Plan, and FFIC shall withdraw all Claims against Debtors and the Estates. In addition, on the Effective Date, Debtors and FFIC shall enter into an agreement

stipulating that such other assets and the FFIC Avoidance Actions are causes of action that are contingent and have no ascertainable fair market value for income tax purposes as of the Effective Date. Such stipulated agreement shall not be binding on the Internal Revenue Service.

d.    Class 4 – Senior Noteholders.

The Senior Noteholders hold a duly perfected secured claim and are owed approximately $27.5 million by Debtors in connection with the Senior Notes, which have been assigned to and are currently held by GMAC CF and will be treated the same as Claims in Class 2. The value of the Senior Noteholders' security is not sufficient to pay that Claim in full.

e.    Class 5 – Other Secured Claimants.

Unless it agrees to receive other, less favorable treatment, each holder of an Allowed Class 5 Claim will receive one of the following treatments as soon as reasonably practical on or after the Effective Date:

(1)    All of that holder's other legal, equitable, or contractual rights with respect to its Class 5 Claim will remain unaltered (including retention of liens securing the Claim) and such claimant will have all of its non-bankruptcy rights;

(2)    The Collateral held by Debtors that is subject to that holder's Class 5 Claim which will be conveyed to such holder by Debtors;

(3)    Such holder of a Class 5 Claim will be paid in Cash in the amount of its Allowed Class 5 Claim; or

(4)    To the extent the Collateral that is subject to that holder's Class 5 Claim is insufficient to satisfy that Claim in full, any deficiency of that holder's Class 5 Claim shall be a Class 6 Claim to the extent it is allowed.

Debtors may select one of those treatments and, if they do not, the Liquidating Trustee, in its sole discretion, will select which of these treatments each holder of an Allowed Class 5 Claim will receive.

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 40 of 55

Except for the disputed Claim of the Napa County Flood Control and Water Conservation District, for which escrowed funds in the sum of $700,000 are held pending resolution of the Napa Dispute, there are no Other Secured Claims against any of Debtors.

  f.  <u>Class 6 – Unsecured Claims</u>.

   As soon as is reasonably practical after the Effective Date, and thereafter from time to time, based on the Liquidating Trustee's review and determination of the Unsecured Claims and any necessary reserve for Disputed Claims, the Liquidating Trustee shall distribute funds pro rata from the Liquidating Trust to each holder of an Allowed Unsecured Claim, provided that each holder of an Allowed Unsecured Claim must first resort to other potential sources of recovery for the payment of its Claim, including, without limitation, insurance proceeds or surety bonds, before receiving any distribution from the Liquidating Trust. The Liquidating Trustee shall review the Unsecured Claims and determine in his or her sole discretion which Unsecured Claims, if any, are subject to this marshalling provision.

   The Liquidating Trust Agreement shall specify the marshalling procedures, which agreement shall be presented to the Court at the Confirmation Hearing. The Liquidating Trust Agreement will provide, among other things, that (1) the Liquidating Trustee shall have discretion to determine which holders of Unsecured Claims must resort first to other potential sources of recovery, (2) the Liquidating Trustee shall give written notice to the holder of each Unsecured Claim whose Claim is subject to marshalling, (3) the notice shall specify the basis for the proposed marshalling of the Unsecured Claim, and (4) the notice shall provide the holder with 28 days notice and opportunity to file a written objection to the marshalling of the Unsecured Claim.

   The Unsecured Claim shall be subject to marshalling as proposed in the Liquidating Trustee's notice and pursuant to the Plan. The Liquidating Trustee periodically will file reports with the Court, as modified from time to time, identifying the Unsecured Claims that are subject to marshalling. If the holder of an Unsecured Claim disputes the amount or availability of the alternative source(s) of recovery, the holder of

1  the Unsecured Claim must file a written objection to the Liquidating Trustee's notice of

2  marshalling.  The Liquidating Trustee then will meet and confer with the holder of the

3  Unsecured Claim to attempt to resolve the objection.  If the objection cannot be resolved,

4  the matter will be set for hearing and decided by the Bankruptcy Court.

5          The Liquidating Trustee shall make appropriate reserve for the Unsecured

6  Claims that are subject to marshalling, before making any distributions to Unsecured

7  Creditors from the Liquidating Trust.

8          Nothing in this marshalling provision is intended to waive, or otherwise

9  impair, any defense available to a claim made against an alternative potential source of

10  recovery pursuant to this provision and/or the Liquidating Trust Agreement, which

11  defenses are specifically reserved.

12          All costs, fees and expenses, including reasonable attorneys' fees and

13  expenses, that are incurred by the Liquidating Trustee after the Effective Date in

14  connection with (a) the administration of the Liquidating Trust, and (b) the allowance and

15  determination of Class 6 Claims, will be funded from the assets of the Liquidating Trust.

16  Such post-Effective Date fees and expenses shall have priority over the Unsecured Claims

17  in Class 6.

18          Representatives of Debtors have reviewed the claims docket for each of these

19  chapter 11 Cases, as well as Debtors' schedules.  After taking into account duplicate

20  claims, claims that were paid on bonded jobs during the course of these cases by the

21  Debtors' bonding company or as a result of stipulations or settlements with project owners

22  to complete works in progress; and further discounting claims for construction defects for

23  which insurance is available,[3] Debtors' best estimate of total allowed Unsecured Claims

24  amounts to a range of between $53.6 million and $32.6 million, depending in large part on

25

26 ─────────────────
           [3]    Many of these claims are disputed and being litigated in various non-
27  bankruptcy courts around the country.  However, to the extent any of the Debtors may be
    found liable, insurance exists, in whole or in part, to cover such claims.

28

W02-SF:FKA\61403693.8                                        DISCLOSURE STATEMENT

the difference between the claim of the Pension Benefit Guaranty Corporation ("PBGC") as filed ($29 million) and as scheduled by Debtors (approximately $8 million).

g.    Class 7 – Interest holders.

All equity interests, including all common stock and any options and warrants related thereto, shall be cancelled as of the Effective Date and the holders of those interests shall be deemed to have rejected the Plan.

G.    Means for Implementation of the Plan.

1.    Merger and Dissolution of Debtors.

Before or after the Effective Date, with the prior written consent of the Senior Secured Lenders and the Committees (and the Liquidating Trustee if he, she or it shall then have been appointed), Debtors are authorized to cause one or more of Debtors other than DCHI to be merged or reorganized with or into another Debtor.  As soon as practical after the Effective Date, at which time all of the assets of each Debtor not otherwise disposed of or distributed by the Plan shall be transferred to the Liquidating Trust, and after the consolidation and transfer of each Debtor's assets into the Liquidating Trust, each Debtor shall be dissolved.  Funding for such dissolutions shall come from the amount funded by the Senior Secured Lenders for the payment of all Administrative Expenses, Priority Tax Claims and Priority Claims (both Allowed and Disputed).  As part of such dissolutions, all of the assets of each Debtor not otherwise disposed of by the Plan shall be contributed to the Liquidating Trust and the Senior Secured Lenders shall surrender their rights to such assets.  In addition, on the Effective Date, every Claim filed in the individual chapter 11 Case of a Debtor will be deemed filed against the assets of the Liquidating Trust.

2.    The Creditors' Committees.

After the Effective Date and through the date of the final distribution under the Plan, the Committees will continue to serve as the representative of holders of Claims in Class 6 and Committee expenses, including reasonable legal fees, shall be paid solely from the Liquidating Trust Assets.  In accordance with the Liquidating Trust Agreement,

-42-

the Committees will also become the Beneficiary Committees under the Liquidating Trust and the representative of the beneficiaries of the Liquidating Trust. From and after the establishment of the Liquidating Trust, the Committees shall have such duties as are consistent with the Liquidating Trust Agreement or as otherwise ordered by the Court, including, but not limited to, the review of Liquidating Trust expenditures and the prosecution of those claims and causes of action that the Trustee or the Court designates to the Committees for collection. Sedgwick, Detert, Moran & Arnold LLP or such other firms as the Committees select, shall serve as Committees' counsel through the date of the final distribution. The Plan provides that the Committees shall be consolidated into a single Committee based on the expanded role assigned to the Committees in the post-confirmation administration of the Cases as described above.

3. Pension Plan.

If not already terminated, the Pension Plan will be terminated in accordance with the Employee Retirement Income Security Act of 1974, as amended, prior to the Effective Date, and any Claims arising from said termination or Claims related to the pension plans will be treated as Class 6 Claims.

4. Cancellation of Stock, Warrants, and Options.

On the Effective Date, all existing Interests (including, without limitation, the Debtors' Existing Common Stock, but not including the capital stock of DCII, which may have been transferred or will be transferred to GMAC CF under the Plan) and all existing warrants and options (if any) will be cancelled, annulled, and extinguished, and any certificates representing those Interests will be void and of no further force and effect. Persons holding the Debtors' Existing Common Stock will retain no rights and receive no consideration on account of those Interests.

5. Objections to Claims and Deadlines.

a. Objection Deadline.

Objections to Claims will be filed with the Court and served on holders of each Claim to which objection is made as soon as practicable, but in no event later than:

(a) six months after the Effective Date; (b) six months after the date on which a particular proof of Claim was Filed; or (c) any other date established by the Court on motion of the Liquidating Trustee without notice or hearing.

      6.    <u>Prosecution of Disputed Claims</u>.

Except as otherwise provided in the Plan, the Liquidating Trust may object to the Allowance of Claims or seek to Subordinate Claims, avoid transfers of property or interests in property of the Debtors, and seek recovery of property, damages or equitable relief. In addition, the Senior Secured Lenders may object to any administrative or priority claim. Objections that are filed and prosecuted as provided in this Section will be litigated to Final Order or compromised and settled in accordance with the terms of the Plan.

      7.    <u>Claims Settlement Procedures</u>.

All Claims may be compromised and settled, with approval of the Court, by the Liquidating Trustee, or the Senior Secured Lenders pursuant to its authority under the Plan. The Senior Secured Lenders shall have standing to object to any settlement regarding any administrative or priority claim.

      8.    <u>Releases</u>

As part of the treatment of the Senior Secured Lenders under Class 2, 3 and 4, the Senior Secured Lenders will enter into complete mutual releases with Debtors on the Effective Date of the Plan. Those releases will mean that the Senior Secured Lenders will not be able to pursue any of their claims on their prepetition loans of approximately $123 million. Also, the Senior Secured Lenders will not be able to pursue their claims on the post-petition loans to Debtors pursuant to the DIP Order, which approximates $21.5 million as of the writing of this Disclosure Statement. This means that significant claims will be released which should allow distributions to the unsecured creditors.

Debtors are also releasing claims against the Senior Secured Lenders. Debtors may have claims against the Senior Secured Lenders for the manner in which the Senior Secured Lenders terminated their post-petition lending to Debtors on short notice, preventing an orderly sale of certain operating companies. However, Debtors feel that the

Plan, in which a full release of those claims is given by Debtors, is beneficial to Debtors' estates. Debtors have reached this conclusion since the claims being released amount to approximately $21.5 million of senior secured claims for post-petition lending and an additional $123 million of prepetition claims. Also, there is no certainty in the claims against the Senior Secured Lenders, as litigation is never certain.

In light of the benefits discussed in the Liquidation Analysis portion of this Disclosure Statement and the conclusion of Debtors that there are no creditor claims against the Senior Secured Lenders, Debtors believe that such releases are reasonable.

H.    Treatment of Executory Contracts, Unexpired Leases, and Indemnification Obligations

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

a.    Rejection.

On the Effective Date, all executory contracts and unexpired leases executed by any Debtor or the Debtors prior to the Petition Date, and not previously assumed or rejected, shall be deemed rejected. The Confirmation Order will constitute a Court order approving such rejections.

b.    Bar Date for Rejection Damage Claims.

Bar Dates have already been established for certain Claims arising from the rejection of specific executory contracts and unexpired leases during the course of the Cases. The Plan does not change those Bar Dates. All other Claims arising from the rejection of executory contracts and unexpired leases, whether arising before or after the Effective Date, must be Filed with the Court and served upon Debtors, Debtors' Counsel and the Liquidating Trustee within 30 days after Confirmation, and will be paid, if Allowed, as a Class 6 Claim under the Plan. If such a Claim is not filed within 30 days after Confirmation, such Claim will be disallowed and the holder of such Claim will not receive any distribution under the Plan.

I.      Tax Attributes of the Plan

        Debtors will not seek a ruling from the Internal Revenue Service prior to the Effective Date with respect to any of the tax aspects of the Plan.  Each holder of a Claim or Interest is strongly urged to consult with a tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

## VI.

## DISTRIBUTION OF PROPERTY

A.      Manner of Cash Payment.

        Distributions to creditors holding Allowed Claims will be made by checks drawn on a bank selected by the Liquidating Trustee, or by wire transfer from such bank, and solely out of the Liquidating Trust Assets.

B.      Unclaimed Property.

        If a distribution remains unclaimed for a period of six months after it has been delivered (or attempted to be delivered) to the holder entitled to receive it under the Plan, the holder will forfeit the Unclaimed Property.  Thereupon, all right, title and interest in and to the Unclaimed Property will immediately and irrevocably vest in the Liquidating Trust, provided, however, that any distribution on account of an Allowed Administrative Expense, Allowed Priority Claim or Allowed Priority Tax Claim will immediately and irrevocably vest in the Senior Secured Lenders.  The holder of an Allowed Claim previously entitled to Unclaimed Property will thereafter cease to be entitled to it.

Case: 03-40516    Doc# 1043    Filed: 06/28/04    Entered: 06/28/04 16:20:18    Page 47 of 55

C. <u>De Minimis Distributions and Fractional Cents</u>.

The Liquidating Trustee will not be required to make any distributions of less than $20.00 to the holder of any Claim and such funds shall be otherwise distributed to the holders of Allowed Claims in accordance with the Plan. Whenever any payments of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

D. <u>Compliance with Tax Requirements</u>.

The Liquidating Trustee will comply with all withholding and reporting requirements imposed on it by governmental units, and all distributions under the Plan will be subject to any such withholding and reporting requirements. The Liquidating Trustee will cause to be prepared in accordance with applicable law and shall cause to be filed all tax returns required to be filed by Debtors and shall pay the taxes shown as due thereon out of assets of the Liquidating Trust in accordance with the Plan and Liquidating Trust Agreement.

E. <u>Setoff and Recoupment</u>.

Notwithstanding anything to the contrary in the Plan, the Liquidating Trustee may, but need not, set off, recoup, or withhold against the distributions to be made on account of any Allowed Claim any claims that Debtors, the Estates, or Liquidating Trustee may have against the Persons holding the Allowed Claims. Neither Debtors nor the Liquidating Trustee will waive or release any claim that they may have against those Persons either by failing to effect such a setoff or recoupment; by allowing any Claim against Debtors, the Estates, or Liquidating Trustee or by making a distribution on account of an Allowed Claim after the Petition Date.

F. <u>Modification of the Plan</u>.

Subject to the restrictions set forth in Bankruptcy Code § 1127, Debtors reserve the right to alter, amend, or modify the Plan before it is substantially consummated.

Case: 03-40516   Doc# 1043   Filed: 06/28/04   Entered: 06/28/04 16:20:18   Page 48 of 55

VII.

LIQUIDATION ANALYSIS

Bankruptcy Code § 1129(a)(7)(A)(ii) of the Code permits the Court to confirm the Plan only if each member of an impaired Class of Claims or Interests who has voted to reject the Plan receives or retains at least the amount or value that such member would receive if Debtors were liquidated in a case under chapter 7 of the Bankruptcy Code.

Well over $1 billion in Claims appear on the Court's registry of claims in the Cases. Debtors reviewed those registers and compared them to the Schedules and Statements of Financial Affairs of each Debtor. After taking into account duplicate claims, claims that were paid on bonded jobs during the course of the Cases by Debtors' bonding company or as a result of stipulations or settlements with project owners to complete works in progress, the releases of the Senior Secured Lenders, and further discounting claims for construction defects for which insurance is available, Debtors' estimate that total allowed Unsecured Claims will range from $53.6 million on the high end to $32.6 on the low end. The $21 million gap between the high and low range is based on the difference between the claim of the PBGC as filed ($29 million) and as scheduled by Debtors (approximately $8 million). The finally allowed claims might be less. Pursuant to the Plan, those Unsecured Claims would receive the benefit of (a) $200,000 to be funded by the Senior Secured Lenders, (b) 7.2% of up to $42.6 million (approximately $3 million) in connection with the Receivable Recoveries, subject to the risks and uncertainty of all litigation; (c) the Avoidance Actions, subject to the risks and uncertainty of all litigation, and (d) the release of all claims against Debtors and their estates by the Senior Secured Lenders. The final level of claims and the recovery in litigation is extremely uncertain. But, assuming claims of $32.6 million at the low end of the range, Debtors believe that creditors might, under certain scenarios, receive a distribution of 25% of their claims. Assuming claims of $53.6 million at the high end of the range, Debtors believe that creditors might, under certain scenarios, receive a distribution of 15%. Under other

scenarios and even under the scenarios discussed immediately above, there is a possibility of no distribution at all. But, as will be discussed in the remainder of this section, any return under this chapter 11 and the Plan is better than the alternatives under a chapter 7.

As discussed above, as of the Petition Date the majority of Debtors' assets were encumbered by the liens and interests of the Senior Secured Lenders of approximately $123 million. Shortly after the Petition Date and pursuant to the DIP Order, the Senior Secured Lenders obtained liens on and interests in all of each Debtors assets. Those liens and interests are also superpriority administrative expense claims against Debtors in the amount of approximately $21.5 million as of the writing of this Disclosure Statement. In a chapter 7, the Senior Secured Lenders superpriority administrative expense claims would be paid before any Unsecured Claims. In addition, the percentage of the Receivable Recoveries that will benefit Unsecured Claimants in a chapter 11 pursuant to the Plan, will not be available in a chapter 7, because the Receivable Recoveries are encumbered by the liens of the Senior Secured Lenders and are highly unlikely to result in recoveries in excess of the amounts owed to the Senior Secured Lenders.

In a chapter 7 case, the chapter 7 trustee would not have access to the $200,000 that the Senior Secured Lenders are contributing to the Liquidating Trustee under the Plan. In a chapter 7 case, Debtors believe that a chapter 7 trustee without access to funding or any unencumbered assets would be greatly hampered in its ability to investigate and evaluate the avoidance actions. Accordingly, in a chapter 7 case, Debtors believe there is a strong likelihood there will be no return to unsecured claimants. Even if a chapter 7 trustee could recover on the avoidance actions, the deficiency claim (discussed below) of the Senior Secured Lenders and their superpriority administrative expense claims would result in the majority, if not all, of any such recovery going to the Senior Secured Lenders.

Debtors believe that a significant delay in distributions would take place if the chapter 11 Cases were converted to chapter 7, because any chapter 7 trustee would

need to familiarize him or herself with the Cases without any money to do so. However, with funding provided as set forth in Debtors' chapter 11 Plan, the Liquidating Trustee will be able to complete a comprehensive analysis of the Avoidance Actions that Debtors project will result in a distribution to unsecured claimants.

Further, in a chapter 7, the undersecured portion of the Senior Secured Lenders' claims (potentially in excess of $100 million) would share in the distribution, if any, to unsecured creditors herein, thus significantly diluting whatever proceeds were recovered from free and clear assets of Debtors' estates.

In addition, Debtors believe consolidation is beneficial in light of the circumstances of the Cases and the sizeable concessions from the Senior Secured Lenders.

VIII.

**PLAN CONFIRMATION**

A.      Voting.

To confirm the Plan, two-thirds in monetary amount and a majority of the number of Claims of the creditors in each impaired Class of creditors entitled to vote on the Plan must vote in favor of the Plan. The holders of Claims in Class 1 are not impaired under the Plan, are deemed to have accepted the Plan, and are not entitled to vote on the Plan. The holders of Claims in Class 2, 3, 4 and 6 are impaired under the Plan and are entitled to vote on the Plan. The holders of Claims in Class 5 are not impaired under the Plan and are not entitled to vote. The holders of Interests in Class 7 will receive and retain nothing under the Plan and, therefore, are deemed to have rejected it. Interest holders in these Classes will, therefore, not receive a Plan, Disclosure Statement or Ballot.

However, if a Class that is impaired under the Plan does not vote in favor of the Plan, Debtors will seek confirmation under the so-called cramdown provisions of Bankruptcy Code § 1129(b), which, under certain circumstances, enables Debtors to confirm a Plan over the objection of one or more classes of claims. If any impaired Class fails to accept the Plan by the statutory majorities described above, Debtors will seek confirmation under Bankruptcy Code § 1129(b).

To be confirmed over the objection of a Class of unsecured Claims, the Plan must provide that no junior Claim or Interest receive anything, and that no senior Class will receive more than 100% on account of its Allowed Claims.

To be confirmed over the objection of a Class of interest holders, the Plan must provide either that each holder of an interest in the Class receive or retain on account of his interest property of a value, as of the Effective Date, equal to the greatest of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the interest, or no holder of any interest that is junior to the interests of the Class receive anything. The Court must also find that no senior Class will receive more than 100% on account of its Allowed Claims.

Acceptance or rejection of the Plan may be voted by completing and signing the Ballot that accompanies the Plan and mailing it to Sheppard, Mullin, Richter & Hampton LLP, Attn: Peter Stone, 4 Embarcadero Center, 17th Floor, San Francisco, California 94111, in an envelope marked "BALLOT" in the lower left hand corner. Only the Ballot should be mailed and, in order to be counted, all Ballots must be received by August 3, 2004, at 5:00 p.m., Pacific Time.

BALLOTS RECEIVED THAT ARE SIGNED BUT DO NOT DESIGNATE ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED ACCEPTANCES. UNSIGNED BALLOTS WILL NOT BE COUNTED.

B.   Confirmation Standards

For the Plan to be confirmed and to be binding on all creditors and Interest holders, the Court must determine that the requirements of Bankruptcy Code § 1129(a) have been satisfied, including that at least one Class of Claims that is impaired under the Plan has accepted the Plan.

C.   Classification of Claims and Interests

The Bankruptcy Code requires that a chapter 11 plan place each Claim and interest in a Class with other Claims or interests that are "substantially similar." The dollar

1   amount of a Claim is usually not a basis on which to distinguish it from other Claims. The

2   Debtors believe that the classification system in the Plan meets the Bankruptcy Code

3   standard.

4   D.     <u>Modification of the Plan</u>

5           The Debtors may modify the Plan at any time before the Confirmation Date.

6   If the Plan is modified, Debtors may be required to provide additional disclosure to

7   creditors and other parties in interest with respect to the Plan, as modified. Any holder of a

8   Claim that has accepted or rejected the Plan will be deemed to have accepted or rejected,

9   as the case may be, the Plan as modified, unless, within the time fixed by the Court, the

10   holder changes its previous acceptance or rejection.

11   E.     <u>Effect of Confirmation</u>

12           If the Plan is confirmed, its terms will be binding on all creditors and Interest

13   holders.

Case: 03-40516    Doc# 1043    Filed: 06/28/04    Entered: 06/28/04 16:20:18    Page 53 of 55

W02-SF:FKA\61403693.8                                        DISCLOSURE STATEMENT

## IX.

## CONCLUSION

The Disclosure Statement has been presented for the purpose of enabling creditors to make an informed judgment to accept or reject the Plan. Creditors are urged to read the Plan in full and consult with their counsel if questions arise. Debtors believe that the acceptance of the Plan by creditors is in the best interest of and will maximize the recovery to all creditors. Debtors thus urge all parties entitled to vote to do so in favor of the Plan.

Dated: June 23, 2004

By:    /s/
                Larry Magelitz
        Vice President – Finance, Chief Financial
        Officer of Dillingham Construction Holdings, Inc.
        and Designated Responsible Individual
                for all Debtors

Presented by:

SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

By:    /s/
                Michael H. Ahrens
                Attorneys for
        Debtors and Debtors-in-Possession

-53-

**APPROVED AS TO FORM:**

DATED: June 23, 2004

SEDGWICK, DETERT, MORAN & ARNOLD, LLP

By _____/s/_____
                    Robert S. Gebhard
       Attorneys for Committees of Watkins Engineers &
        Constructors, Inc., and Inland Industrial
                Contractors, Incorporated

DATED: June 23, 2004

BUCHALTER, NEMER, FIELDS & YOUNGER,
Professional Corporation

By _____/s/_____
                    Shawn M. Christianson
       Attorneys for Fireman's Fund Insurance Company

DATED: June 23, 2004

ADORNO & YOSS, P.A.

By _____/s/_____
                    Charles M. Tatelbaum
       Attorneys for GMAC Commercial Finance LLC

W02-SF:FKA\61403693.8                                    DISCLOSURE STATEMENT